UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE TRAVELERS INDEMNITY COMPANY, successor in interest by merger to GULF INSURANCE COMPANY and GULF UNDERWRITERS INSURANCE COMPANY,<br><br>　　　　　　　　　　　　Plaintiffs,<br>vs.<br><br>ARENA GROUP 2000, L.P., d/b/a SAN DIEGO SPORTS ARENA CO., d/b/a SAN DIEGO ENTERTAINMENT, INC., and THE CITY OF SAN DIEGO,<br><br>　　　　　　　　　　　　Defendants. | CASE NO. 05CV1435 JLS (CAB)<br><br>**ORDER (1) DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, (2) GRANTING DEFENDANT ARENA GROUP'S MOTION FOR SUMMARY JUDGMENT, and (3) GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION TO STRIKE**<br><br>(Doc. Nos. 189, 195, 220) |

Presently before the Court are cross-motions for summary judgment.[1] Arena Group 2000, L.P. ("Arena Group" or "defendant") moves for summary judgment as to Count IV of the complaint, i.e., that Gulf Underwriters Insurance Company has no obligation to defend or

---

[1] This case was originally assigned to the Hon. Thomas J. Whelan. On September 25, 2007, this case was reassigned to the Hon. Janis L. Sammartino. The cross-motions for summary judgment were fully briefed and pending for decision at the time of reassignment. Furthermore, on September 18, 2007, the other remaining defendant, City of San Diego, filed a motion for attorney fees and costs. (Doc. No. 261.) The parties completed briefing on the City's motion on October 22, 2007. (Plaintiffs' subsequently request to file a surreply is currently pending before the Court.) The Court has taken the City's motion for attorney fees under submission and will issue a written order in due course.

indemnify under its commercial excess liability policy ("umbrella policy"), based on the "Designated Premises or Project Limitation of Coverage Endorsement" ("DPPE"). (Doc. No. 189.) Plaintiffs The Travelers Indemnity Company, successor in interest by merger to Gulf Insurance Company ("Gulf Insurance") and Gulf Underwriters Insurance Company ("Gulf Underwriters") (collectively, "Gulf" or "plaintiffs") move for summary judgment on their complaint, i.e., that they are entitled to a declaration that their commercial general liability policy ("primary policy"), as well as their umbrella policy, does not cover certain claims asserted against Arena Group, and, therefore, that plaintiffs are entitled to reimbursement of sums paid for those claims. (Doc. No. 195.) Plaintiffs subsequently moved to strike three declarations that defendant submitted with its opposition to plaintiffs' motion for summary judgment. (Doc. No. 220.)

**FACTUAL BACKGROUND**

Since 1993, Arena Group has operated the San Diego Sports Arena at 3500 Sports Arena Boulevard by a lease agreement with the City of San Diego. (Ventrell Decla., Exhibit 2, at 00043-66.) Beginning in 1996, Arena Group applied for and purchased primary and umbrella (a/k/a "excess") insurance policies from Gulf.[2] (Id., Exhibit 3, at 00073.) In December 1999, Arena Group acquired the leasing rights to operate and maintain the Sports Arena Square ("Shopping Center") on the 3340-60 blocks of Sports Arena Boulevard. (McKenna Decla. ISO Pls. Motion, Exhibit 2, at 00039.) The Shopping Center is east of the Sports Arena. (Hilding Decla. ISO Motion, Exhibit 8, at 00221.) Arena Group applied for general liability coverage, but not excess liability coverage, for the Shopping Center. (Ventrell Decla., Exhibit 31, at 00405.) Gulf provided general liability coverage for the Shopping Center from October 1, 2001 to February 21, 2002; at all other times, Arena Group obtained coverage from the Shopping Center from other carriers. (Id., Exhibits 35-36.)

On February 22, 2003, Mr. Daniel Doll and Ms. Shelby Olerich-Snow were walking from the Black Angus Restaurant in the Shopping Center along a walkway toward the Sports Arena. (Hilding Decla. ISO Motion, Exhibit 7, at 00202-03.) As Mr. Doll and Ms. Snow walked under a

---

[2] Arena Group's broker was Westland Insurance Brokers ("Westland"). Gulf's broker was L.A.Xcess Insurance Brokers.

marquee sign on the Shopping Center property, the two-ton sign collapsed, rendering Mr. Doll a paraplegic. (Id. at 00203.)

At the time of the underlying accident, Gulf's 2002-03 policies were in effect. Arena Group used the same application for both policies. (Ventrell Decla., Exhibit 17, at 00144.) In the Applicant Information section, the name of the insured is "San Diego Sports Arena" and the first line of its mailing address is "DBA: San Diego Sports Arena, 3500 Sports Arena Blvd." (Id.) The primary policy's schedule of named insureds lists "Arena Group 2000, LLC, DBA: San Diego Sports Arena; DBA: San Diego Entertainment, LLC." (Id., Exhibit 25, at 00206.) The policy lists "Sports Arena" in the business description. (Id. at 00205, 00207, 00218.) On the declaration list of all premises owned, rented, or occupied by the insured, the only premises identified is "3500 Sports Arena Boulevard, San Diego, CA 92110-000." (Id. at 00208.) Endorsements with exclusions for particular bodily injuries contain "Sports Arena" in the description of operations. (Id. at 00210-11.)

The umbrella policy applies "anywhere in the world." (Hilding Decla. ISO Motion, Exhibit 1, at 00044.) "Arena Group 2000 LLC[3]" is listed as the named insured, and its mailing address is "3500 Sports Arena Blvd." (Id. at 00001.) The umbrella policy's definition of "advertising injury" is limited to "'offenses' . . . committed in the course of advertising [the insured's] goods or products," and the definition of "personal injury" is limited to "'offenses' [that] arise out of the conduct of [the insured's] business." (Id. at 00052.) The definition of "bodily injury" is not so limited. (Id.) The DPPE restricts coverage to bodily injury et al. "arising out of . . . [t]he project shown in the Schedule," where the only project listed is "San Diego Sports Arena." (Id., at 00038.) Although the DPPE's text lists October 1, 2002 as its effective date (id.), Ms. Pamela Asbury, Gulf's umbrella underwriter, testified that the correct effective date should have been July 31, 2003.[4] (Id., Exhibit 6, at 00175.) After Ms. Asbury's deposition, plaintiffs

---

[3] The parties concede that "Arena Group 2000 LLC" does not exist because Arena Group is, in fact, organized as a limited partnership.

[4] July 31, 2003 corresponds with the effective date of the commercial general liability policy that Arena Group obtained through Lexington Insurance. The Lexington policy contained new endorsements that had not appeared in Gulf's primary policies. (Hilding Decla. ISO Motion, Exhibit

abandoned the DPPE as a grounds for denying coverage under the umbrella policy. (Pls. Memo. ISO Motion, at 6 n.7.)

On February 23, 2004, Mr. Doll filed a complaint for personal injuries and damages against Arena Group, inter alia. (Hilding Decla. ISO Motion, Exhibit 7.) Mr. Doll twice amended the complaint. (Pls. Memo. ISO Motion, at 8-9.) In the second amended complaint ("SAC"), dated June 13, 2005, Mr. Doll alleged a single cause of action against Arena Group for premises liability. The SAC alleged that Arena Group "leased and operated the Sports Arena and the adjacent subject property where the sign structure . . . w[as] located. At all times relevant, [Arena Group] invited and encouraged patrons of the Sports Arena to use, occupy and park at the subject property." (Hilding Decla. ISO Motion, Exhibit 8 ¶ 20.) According to the SAC, Arena Group "had a duty to appropriately maintain and inspect their premises including the sign structure" and negligently breached that duty "by allowing said sign structure to exist in a dangerous and defective condition." (Id. ¶ 23; see also ¶ 29 (alleging that Arena Group and other defendants "as the lessees and operators of the premises as herein above alleged, had a continuing duty to maintain, repair, and/or remove said sign structure[.]") The SAC further alleges that Mr. Doll suffered injury and damages as the "direct and proximate result of [defendants'] negligence[.]" (Id. ¶ 48.)

On December 1, 2005, the Superior Court entered an Order granting certain defendants' (including Arena Group) motion for determination of good faith settlement. (Ventrell Decla., Exhibit 44, at 00488-90.) Gulf contributed $7.218 million of a total settlement of $11.21 million.[5] (Pls. Memo. ISO Motion, at 11.) Both by prior letter to Arena Group and in the settlement agreement itself, Gulf reserved its rights to litigate its indemnity obligations and to seek reimbursement of the amounts paid in settlement. (Ventrell Decla. Exhibits 42 & 43, at Recital I.)

**PROCEDURAL BACKGROUND**

On July 18, 2005, plaintiffs initiated the present action for a declaratory judgment that Gulf

---

6, at 00156.)

[5] The Doll and Snow actions were eventually consolidated. Gulf contributed $7.148 million of the $11 million settlement of the Doll action, and $70 thousand of the $210 thousand settlement of the Snow action.

has no obligation to defend, pay expenses for, or indemnify Arena Group and the City of San Diego in connection with the lawsuits filed by Mr. Doll and Ms. Snow. (Compl. ¶ 1.) Plaintiffs further sought reimbursement of sums paid under Gulf's policies to settle those lawsuits. (Id.)

Prior to the reassignment of this case, Judge Whelan ruled on several motions for summary judgment. On January 12, 2006, Judge Whelan denied plaintiffs' motion for summary judgment on the duty to indemnify, because of disputes of material fact arising before discovery had commenced. (Doc. No. 71.)

On March 10, 2006, Judge Whelan granted in part and denied in part defendants' motion for summary judgment. (Doc. No. 105.) Judge Whelan held that plaintiffs had a duty to provide defendants with a defense in the underlying Superior Court litigation. (Id. at 12-13.) Because of a factual dispute regarding the parties' intent as to the umbrella policy's scope of coverage, Judge Whelan denied summary judgment on plaintiffs' duty to indemnify. (Id. at 17.)

On December 6, 2006, Judge Whelan denied Arena Group's motion for summary judgment on its third-party complaint against Crum & Forster Specialty Insurance Company. (Doc. No. 142.) Specifically, Judge Whelan denied Arena Group's request for a declaration that, as an additional insured, it was not responsible for paying the "Retained Amount" due under Crum & Forster's policy. (Id. at 8.) Judge Whelan further held that payments by Arena Group's other insurers did not satisfy the "Retained Amount." (Id. at 10.) After further finding that doctrines of waiver and estoppel did not preclude Crum & Forster from enforcing the Retained Amount obligation against Arena Group, Judge Whelan granted Crum & Forster's cross-motion for summary judgment on March 8, 2007. (Doc. No. 164.)

On June 19, 2007, Judge Whelan granted the City of San Diego's motion for summary judgment because plaintiffs failed to comply with the requirements of the Federal Tort Claims Act. (Doc. No. 208.)

Defendant filed its present motion for summary judgment on May 31, 2007. (Doc. No. 189.) Plaintiffs filed their present motion for summary judgment the same day. (Doc. No. 195.) The parties filed timely oppositions and replies. Plaintiffs filed their motion to strike on June 29, 2007. (Doc. Nos. 219-20.) Although the matters were initially taken off calendar and under

submission, the Court subsequently set the matters for a motion hearing and held oral argument on November 2, 2007.

**MOTION TO STRIKE**[6]

**A.   Legal Standard**

Pursuant to Federal Rule of Civil Procedure 12(f):

> Upon motion made by a party before responding to a pleading or, if no responsive pleading is permitted by these rules, upon motion made by a party within 20 days after the service of the pleading of the party or upon the court's own initiative at any time, the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter.

"A motion to strike should not be granted unless the matter to be stricken clearly could have no possible bearing on the subject of the litigation.  If there is any doubt whether the portion to be stricken might bear on an issue in the litigation, the court should deny the motion." Platte Anchor Bolt, Inc. v. IHI, Inc., 352 F. Supp. 2d 1048, 1057 (N.D. Cal. 2004) (internal citations omitted). The Court views the pleading in the light most favorable to the nonmoving party. In re 2TheMart.com, Inc. Sec. Litig., 114 F. Supp. 2d 955, 965 (C.D. Cal. 2000).

**B.   Analysis**

   **1.   Chihak Declaration**

In its opposition to plaintiffs' motion for summary judgment, defendant submitted the declaration of Cynthia Chihak, counsel for Mr. Doll.  Ms. Chihak explains her intent and reasoning in filing the SAC.  Defendant offers the Chihak declaration in support of its argument that the SAC pled a cause of action against Arena Group as operator of the Sports Arena. Plaintiffs object that Ms. Chihak's intent in filing the SAC is irrelevant: the SAC, instead, speaks for itself. Because California law focuses exclusively on the allegations in the complaint, without regard for counsel's intent, the Court finds for plaintiffs and grants the motion to strike the Chihak declaration.

//

---

[6] In addition to plaintiffs' formal motion to strike, both sides submitted numerous evidentiary objections to the evidence submitted in support of each party's motion for summary judgment.  In deciding the present cross-motions, the Court only considered admissible evidence. Concerning defendant's request for judicial notice, the Court grants that request with respect to Judge Whelan's prior Orders and the pleadings in the underlying Superior Court litigation.

### 2. Sanders Declaration

Also in its opposition, defendant submitted the declaration of John Sanders, who, during the relevant period, was employed as Vice President of Facility Operations at Arena Group. Mr. Sanders explains his understanding that the umbrella policy provided coverage for Arena Group's operations at the Sports Arena and Shopping Center, even though Mr. Sanders directed Arena Group's broker to amend the named insured on various policies to read "Arena Group 2000 LP, San Diego Entertainment, Inc. DBA, San Diego Sports Arena." (Sanders Decla. ¶¶ 3, 9, 13.) Plaintiffs object that Mr. Sanders's declaration reflects his undisclosed intent and contradicts his deposition testimony. The Court finds that the Sanders declaration may bear on the issues in this litigation, and, in particular, does not actually conflict with his deposition testimony. Instead, plaintiffs' arguments go toward the weight that the Court should place on the Sanders Declaration. Therefore, the Court denies the motion to strike.

### 3. Bedoe Declaration

Also in its opposition, defendant submits the declaration of Ralph Bedoe, chief engineer for the Sports Arena. Mr. Bedoe describes instances when Sports Arena's engineering department performed maintenance services on Shopping Center property. Plaintiffs object that Mr. Bedoe offers insufficiently vague testimony on issues that were not raised at the time when the parties settled the underlying Doll litigation. The Court did not consider the Bedoe Declaration in deciding the present cross-motions for summary judgment. Therefore, the Court denies the motion to strike as moot.

## CROSS-MOTIONS FOR SUMMARY JUDGMENT

### A. Legal Standard

Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Freeman v. Arpaio, 125 F.3d 732, 735 (9th Cir. 1997). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return

a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. Id. at 322-23. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

"The district court may limit its review to the documents submitted for the purpose of summary judgment and those parts of the record specifically referenced therein." Carmen v. S.F. Unified Sch. Dist., 237 F.3d 1026, 1030 (9th Cir. 2001). Therefore, the Court is not obligated "to scour the record in search of a genuine issue of triable fact." Keenan v. Allen, 91 F.3d 1275, 1279 (9th Cir. 1996) (internal citation omitted). If the moving party fails to discharge this initial burden, summary judgment must be denied, and the Court need not consider the nonmoving party's evidence. Adickes v. S.H. Kress & Co., 398 U.S. 144, 159-60 (1970).

If the moving party meets this initial burden, the nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Triton Energy Corp. v. Square D Co., 68 F.3d 1216, 1221 (9th Cir. 1995) (citing Anderson, 477 U.S. at 252) ("The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient."). Rather, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).

**B.     Plaintiffs' Motion**

    1.     California Insurance Law

A court must interpret a contract "to give effect to the mutual intention of the parties as it

existed at the time of contracting[.]" Cal. Civ. Code § 1636.  For written contracts, "the intention of the parties is to be ascertained from the writing alone, if possible[.]" Id. § 1639; Haynes v. Farmers Ins. Exch., 32 Cal. 4th 1198, 1204 (Cal. 2004) (applying § 1639 to an insurance contract). The contract language, therefore, determines its interpretation "if the language is clear and explicit."  Cal. Civ. Code § 1638; Bank of the West v. Superior Court, 2 Cal. 4th 1254, 1264 (Cal. 1992); see Blackhawk Corp. v. Gotham Ins. Co., 54 Cal. App. 4th 1090, 1098 (Cal. Ct. App. 1997) ("where the language of a contract is clear, we ascertain intent from the plain meaning of its terms and go no further").  The contract's words "are to be understood in their ordinary and popular sense . . . unless used by the parties in a technical sense, or unless a special meaning is given to them by usage[.]" Cal. Civ. Code § 1644; MacKinnon v. Truck Ins. Exch., 31 Cal. 4th 635, 647-48 (Cal. 2003).

A policy provision is truly ambiguous if the provision is capable of two or more reasonable constructions.  Waller v. Truck Ins. Exch., Inc., 11 Cal. 4th 1, 18 (Cal. 1995); ACS Sys., Inc v. St. Paul Fire & Marine Ins. Co., 147 Cal. App. 4th 137, 146 (Cal. Ct. App. 2007).  To interpret an ambiguous policy provision, the court must "give effect to the insured's objectively reasonable expectations."  Kavruck v. Blue Cross of Cal., 108 Cal. App. 4th 773, 782 (Cal. Ct. App. 2003). To determine whether coverage is warranted, "courts must focus on the nature of the risk and the injury, in light of the policy provisions[.]" Vandenberg v. Superior Court, 21 Cal. 4th 815, 840 (Cal. 1999); Cont'l Cas. Co. v. Superior Court, 92 Cal. App. 4th 430, 446 (Cal. Ct. App. 2001).

Extrinsic evidence is admissible if "the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible."  Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co., 69 Cal. 2d 33, 37 (Cal. 1968); Wolf v. Superior Court, 114 Cal. App. 4th 1343, 1356 (Cal. Ct. App. 2004).  Relevant types of admissible evidence include the circumstances of the parties' negotiation and entry into contract; the contract's object, nature, and subject matter; and the parties' subsequent conduct.  Wolf, 114 Cal. App. 4th at 1356-57 (quoting Morey v. Vannucci, 64 Cal. App. 4th 904, 912 (Cal. Ct. App. 1998)).  One of the most reliable ways to discern the parties' intent is the practical construction that the parties placed on the contract before the dispute arose.  Bohman v. Berg, 54 Cal. 2d 787, 795 (Cal. 1960); Kitty-Anne

Music Co. v. Swan, 112 Cal. App. 4th 30, 37 (Cal. Ct. App. 2003).

2. Primary Policy

The Court finds that the parties intended the primary policy to limit its coverage to defendant's Sports Arena operations. In Fidelity & Deposit Co. v. Charter Oak Fire Insurance Co., the California Court of Appeal reviewed a policy issued to "Western Savings & Loan Assoc ["WSLA"] DBA Marina Inn," where the Marina Inn was a motel and restaurant that WSLA acquired in Russellville, Arkansas. 66 Cal. App. 4th 1080, 1083 (Cal. Ct. App. 1998). The policy's declarations page further stated that the business of the named insured was "Motel & Restaurant" and the applicable buildings were a "motel" and "office, restaurant" with an Arkansas address. Id. The Court of Appeal held that this policy did not cover a cause of action for construction defects in WLSA's townhome development in Pomona, California because the policy, "when read as a whole, clearly limit[ed] coverage to a motel and restaurant in Russellville, Arkansas." Id. at 1087. In addition to the statements on the declarations page, the Court of Appeal noted "[t]he insured's payment of a relatively small premium" and concluded that the policy did not cover all of WSLA's development projects nationwide. Id. at 1086.

The Charter Oak analysis, applied to these facts, warrants a conclusion that the primary policy covered the Sports Arena operations, but not the Shopping Center operations. Although the Shopping Center premises are adjacent to the Sports Arena (rather than in another state), the primary policy contains similar limitations on the coverage territory. At the time of the accident, the primary policy listed the named insured as "Arena Group 2000, LLC; DBA: San Diego Sports Arena; DBA: San Diego Entertainment, Inc." The declarations identify the insured's business as "Sports Arena." In the blank for "All Premises" owned, rented, or occupied by the insured, the only listed premises is the address for the Sports Arena, i.e., 3500 Sports Arena Boulevard. The extrinsic evidence supports this conclusion. From the time that Arena Group acquired the Shopping Center premises in 1999, it sought separate general liability coverage for that premises (even through Gulf, for a time). If Arena Group believed that its Sports Arena primary policy also covered the Shopping Center premises, Arena Group would not have sought that separate coverage.

However, the application of Charter Oak does not end the inquiry because, in deciding an insurance coverage dispute arising from claims that settled before trial, the Court "look[s] to the allegations of the underlying complaints and assume[s] [the defendant] would be held liable for the damages alleged therein." Armstrong World Indus., Inc. v. Aetna Cas. & Sur. Co., 45 Cal. App. 4th 1, 109 (Cal. Ct. App. 1996); see Bankwest v. Fid. & Deposit Co. of Md., 63 F.3d 974, 981 n.3 (10th Cir. 1995) (reasoning that "in assessing the existence of the duty to defend and the duty to indemnify, the language of the petition and the other pleadings in the [underlying] case should control"). Relevant to the facts here, under California premises liability law, a property owner can be held liable, in certain circumstances, for injuries occurring on adjacent property. According to the California Supreme Court, "[a]s long as the defendant exercised control over the [adjacent] land, the location of the property line would not affect the defendant's potential liability." Alcaraz v. Vece, 14 Cal. 4th 1149, 1161 (Cal. 1997). Furthermore, the duty of an occupant of land extends to situations when the occupant "invites intended customers to use . . . another's property over which [the occupant's] right of control is, perhaps, more apparent than actual."[7] Southland Corp. v. Superior Court, 203 Cal. App. 3d 656, 667 (Cal. Ct. App. 1988) (quoting Nevarez v. Thriftimart, Inc., 7 Cal. App. 3d 799, 804 (Cal. Ct. App. 1970)).

In Alcaraz, where a tenant sued his landlords for injuries sustained when he stepped into a water meter box, the trial court granted summary judgment to the defendants because the meter box was on a two-foot-wide strip of land owned by the municipality, rather than the landlords. 14 Cal. 4th at 1152. The California Supreme Court affirmed the Court of Appeal's reversal of summary judgment "because a triable issue of fact exists concerning whether defendants nevertheless exercised control over the property surrounding the meter box and thus had a duty to protect plaintiff from, or warn him of, the hazardous condition of the meter box." Id. at 1161. The court cited the evidence that the defendant landlords maintained the lawn over the strip of land

---

[7] The defendant does not have to derive a commercial benefit from the adjacent land to exercise control sufficient to establish liability. Alcarez, 14 Cal. 4th at 1162. This legal rule forecloses plaintiffs' argument that Arena Group did not benefit economically from allowing Sports Arena patrons to park in the Shopping Center because Arena Group charged a fee for parking in the Sports Arena surface lot. When Sports Arena patrons such as Mr. Doll parked offsite, Arena Group actually lost money because he did not pay a parking fee. But, this economic reality does not matter because control, rather than commercial benefit, is the operative inquiry.

1  surrounding the meter box and, after the accident, constructed a fence around the entire lawn,
2  including the portion owned by the city. Id. at 1161-62.

3  Similarly, in Southland Corp., the Court of Appeal denied writ relief to the owners and
4  operators of a 7-Eleven store in a negligence action filed by a customer who was assaulted in a
5  parking lot adjacent to the property leased to the store. 203 Cal. App. 3d at 660-61. The court
6  found evidence to support a finding "that petitioner did exercise a sufficient control over the lot so
7  as to legally permit the imposition of a duty to those customers using the lot." Id. at 666. The
8  specific evidence included the inadequate number of parking spaces on the leased premises, a
9  lease provision which allowed petitioners' customers to have non-exclusive use of the spaces in
10 the adjacent parking lot, and petitioners' knowledge that customers parked in the adjacent lot
11 (without any corresponding effort to discourage customers from parking there). Id. at 666-67.

12 Applying these cases to the facts at hand, the Court finds that the Doll SAC—i.e., the
13 operative pleading at the time that the parties settled the underlying action—adequately pled a
14 cause of action for premises liability against Arena Group in its capacity as operator of the Sports
15 Arena premises. Paragraph 20 of the SAC describes Arena Group as the lessee and operator of
16 both the Shopping Arena and the Shopping Center premises. Paragraphs 23 and 29 allege a duty
17 of Arena Group to maintain the sign in a safe condition as the "lessees and operators of the
18 premises as herein above alleged[.]" The SAC further contains allegations that Arena Group, in its
19 capacity as lessee and operator of the Sports Arena, exercised control over the adjacent Shopping
20 Center premises. Specifically, the SAC alleges actual control in that Arena Group leased and
21 operated the Shopping Center, and apparent control in that Arena Group "invited and encouraged"
22 Sports Arena visitors to "use, occupy and park" at the Shopping Center. Although plaintiff cites
23 language elsewhere in the SAC describing Arena Group as the lessee and operator of the Shopping
24 Center, those allegations do not undercut the separate and distinct description of Arena Group as
25 the lessee and operator of the Sports Arena. In effect, Doll's counsel pled a premises liability
26 claim against Arena Group in two capacities—as the lessee-operator of the Sports Arena, and the
27 lessee-operator of the Shopping Center. Plaintiffs point to no rule of law that would preclude
28 Doll's counsel from broadly pleading (and thus maximizing Doll's prospects for potential

recovery) in this fashion.

Because Doll adequately pled a cause of action for premises liability against Arena Group, as lessee and operator of the Sports Arena, for an injury taking place on the adjacent Shopping Center premises, the Court finds that the primary policy covered the underlying accident. As the Doll and Snow actions settled before trial, the Court must assume Arena Group would have been found liable for the damages associated with the allegations in the underlying complaint. These damages would include Arena Group's liability for its negligence, as the lessee and operator of the Sports Arena, in maintaining the adjacent Shopping Center property, over which it exercised actual and apparent control. Therefore, the primary policy provides coverage for the underlying accident, even though that policy's scope is limited to Arena Group's Sports Arena operations, because Arena Group is presumed liable for negligence in its operations of the Sports Arena. For the reasons stated herein, the Court denies plaintiffs' motion for summary judgment with respect to the primary policy.

3.    Umbrella Policy

The Court incorporates by reference its discussion supra of the legal standard for interpreting an insurance contract. Beginning with the language of the contract, the Court finds no provision that would limit the umbrella policy's scope to Arena Group's operations at the Sports Arena. Whereas the primary policy contains specific provisions that limit its scope to the Sports Arena (including "d/b/a" language, and specific descriptions of the named insured's business and premises), no comparable provisions appear in the umbrella policy. Furthermore, when the umbrella policy limits the scope of coverage for particular injuries, it does so explicitly. E.g., covered advertising injuries "must be committed in the course of advertising," and covered personal injuries "must arise out of the conduct of your business[.]" (Hilding Decla. ISO Motion, Exhibit 1, at 00052.) With respect to "bodily injury," particular endorsements create exclusions from coverage. (See, e.g., Endorsement Nos. 1 (athletic participants exclusion), 5 ("cross liability" exclusion for, inter alia, the bodily injuries of individuals affiliated with Arena Group), 6 (nuclear energy exclusion), 10 (worker's compensation exclusion), & 11 (watercraft liability exclusion).)

Plaintiffs respond by citing a litany of extrinsic evidence in support of their argument that

the parties intended to limit umbrella policy coverage, including coverage for bodily injuries, to Arena Group's operations at the Sports Arena. For example, the application that Westland submitted to LA Xcess, which Gulf relied on in evaluating the risk and rating the umbrella policy, listed the insured's name as "San Diego Sports Arena DBA San Diego Sports Arena." (Kornblum Decla., Exhibit 21, at 0350.) Mr. Todd Tropio, the Westland employee who submitted Arena Group's insurance applications to Gulf, testified in his deposition that Arena Group sought to purchase insurance from Gulf only for its Sports Arena operations, and not for the Shopping Center. (See Pls. Opp. to MSJ, at 4-7 (quoting from McKenna Opp. Decla., Exhibit 2, at 045-053).) Furthermore, after the 2002-03 umbrella policy went into effect (and, indeed, after the underlying accident took place), Westland directed LA Xcess to amend the named insured on the policies to read "Arena Group 2000 LP dba: San Diego Sports Arena & San Diego Entertainment Inc." (Ventrell Decla. ISO Motion, Exhibit 46.) And, when plaintiffs added a DPPE to subsequent umbrella policies, the premium did not change. (Ventrell Decla., Exhibit 29, at 0395.)

Despite presenting all this extrinsic evidence, plaintiffs fail to tether that evidence to a particular policy provision which is genuinely ambiguous. Plaintiffs claim the ambiguity lies in the term "Arena Group 2000, LLC," an entity that does not exist. (See Pls. Opp. to MSJ, at 11-12.) However, the fact that Arena Group is actually organized as a limited partnership, rather than a limited liability company, does not give plaintiffs or this Court license to read into the policy "d/b/a" language, a limiting description of the named insured's business and premises, or the words "Sports Arena" on endorsements excluding types of bodily injuries.

Furthermore, the extrinsic evidence does not entirely favor plaintiffs. While Arena Group affirmatively procured separate general liability coverage after acquiring the Shopping Center, it did not procure a separate umbrella policy for the Shopping Center. If Arena Group believed that its existing umbrella policy did not cover the Shopping Center, it would have likely undertaken efforts to procure such coverage.[8] Furthermore, Mr. Nicholas Licato, Gulf's Rule 30(b)(6)

---

[8] In a footnote of one brief (see Pls. Opp. to MSJ, at 15 n.5) and at oral argument, plaintiffs cite to a letter from Elizabeth Nolan, property manager for the Shopping Center, to Mr. Tropio stating that an umbrella policy "would not be necessary to be in compliance" with the insurance requirements of Arena Group's lease with the City of San Diego. (McKenna Opp. Decla., Exhibit 3, at 076.) The

1  designee, testified that, if Gulf knew Arena Group had two separate operations and wanted to limit
2  policy coverage to the Sports Arena operations, the proper way to limit coverage would be to
3  include an endorsement (i.e., a DPPE).  (Def. Request for Judicial Notice, Exhibit 3, at 000100-
4  02.)  Ms. Asbury corroborated Mr. Licato's opinion when she testified that a designated location
5  endorsement would effectively limit the insurer's exposure when the insured owned multiple
6  premises.  (Id., Exhibit 6, at 00147-48.)  The parties do not dispute that the umbrella policy in
7  effect at the time of the accident lacked any such endorsement.  Furthermore, Gulf indisputably
8  knew that Arena Group operated the Shopping Center premises when Gulf issued the 2002/03
9  umbrella policy.  Gulf's knowledge is established by correspondence between Westland and LA
10 Xcess inquiring about general liability coverage when Arena Group first acquired the Shopping
11 Center premises, and by Gulf's actually providing primary coverage for the Shopping Center
12 during a portion of 2001-02.  (Hilding Opp. Decla, Exhibits 8-9.)  Despite knowing that Arena
13 Group operated the Shopping Center premises at the time the relevant umbrella policy was issued,
14 plaintiffs failed to add an endorsement to the umbrella policy that would limit coverage to the
15 Sports Arena operations.

16 　　　In short, the Court finds that the language of the umbrella policy is not reasonably
17 susceptible to a construction that would limit coverage to bodily injuries arising from Arena
18 Group's Sports Arena operations.  Specifically, the policy applies "anywhere in the world," lacks
19 the coverage-limiting provisions of the primary policy, and does not limit the definition of "bodily
20 injury" in ways that other types of injuries are limited.  Furthermore, because the extrinsic
21 evidence is mixed, the Court finds that plaintiff insurers failed to carry their burden of showing
22 that the parties mutually intended to limit umbrella policy coverage to the Sports Arena operations.
23 See Haynes, 32 Cal. 4th at 1204 (recognizing insurer's burden to "mak[e] coverage exceptions and
24 limitations conspicuous, plain and clear").  For the reasons stated herein, the Court denies

---

28  Court finds that this single exhibit does not warrant plaintiffs' far-reaching conclusion that defendant "deliberately chose not to buy umbrella insurance for the Shopping Center[.]" (Pls. Opp. to MSJ, at 15 n.5.)

plaintiffs' motion for summary judgment with respect to the umbrella policy.[9]

**C.     Defendant's Motion**

In Count IV of the complaint, plaintiffs allege:

> Because the Second Amended Complaints [in the Doll and Snow actions] only assert claims against Arena Group 2000, L.P. . . . based on [its] alleged failure to maintain the sign at the Shopping Center, there is no coverage for the Doll and Snow actions under the Excess Policy and, in particular, the [DPPE]. Accordingly, Gulf seeks and is entitled to obtain an adjudication of the parties' rights and obligations under the Excess Policy and, more specifically, a judicial declaration that there is no coverage under the Excess Policy pursuant to the [DPPE].

To the extent that Count IV relies on the DPPE, defendants are entitled to summary judgment. After Ms. Asbury, the umbrella underwriter, testified in her deposition that the DPPE's actual effective date was not October 1, 2002 (as written in the policy) but, instead, July 31, 2003 (a date after the underlying accident took place), plaintiffs voluntarily abandoned the DPPE as a basis for denying coverage under the umbrella policy. (Hilding Decla. ISO Motion, Exhibit 6, at 218:1-8, & 219:9-12; Pls. Memo. ISO Motion, at 6 n.7.)  Defendant characterizes Count IV as being "based **solely** upon the [DPPE.]" (Def. Memo. ISO Motion, at 10 (emphasis in the original).)  Therefore, defendant claims it is entitled to summary judgment on the entirety of Count IV simply by virtue of plaintiffs' abandonment of their DPPE argument.  The Court does not read Count IV so narrowly.  While Count IV invokes the DPPE as a basis for a declaration of "no coverage," it also invokes the umbrella policy more generally, and requests an adjudication of the parties' rights and obligations under the entire policy.

This broad pleading of Count IV is unavailing to plaintiffs, however, based on the Court's interpretation of the umbrella policy supra.  The Court has found that the umbrella policy did not limit coverage for bodily injury to defendant's Sports Arena operations.  Furthermore, even if the umbrella policy limited coverage to the Sports Arena operations, the Second Amended Complaint

---

[9] Even if the Court's interpretation of the umbrella policy were incorrect, Arena Group would still prevail, for the same reason that Arena Group prevails with respect to the primary policy. I.e., even if the parties mutually intended, as a matter of law, to limit the scope of the umbrella policy to the Sports Arena operations, Mr. Doll adequately pled, in the underlying Superior Court lawsuit, a cause of action for premises liability against Arena Group in its capacity as operator of the Sports Arena.  Because Arena Group is presumed liable for the damages pled in the complaint, Armstrong World Industries, 45 Cal. App. 4th at 109, the umbrella policy, as well as the primary policy, provides coverage for the underlying accident, even if neither policy covers the Shopping Center operations.

in the underlying <u>Doll</u> action pled a cause of action for premises liability against Arena Group in its capacity as operator of the Sports Arena. Therefore, defendant is entitled to summary judgment on Count IV of the complaint—with respect to both the DPPE, which was not in effect on the date of the accident, and the entire umbrella policy, which provided coverage for the underlying bodily injury.

## CONCLUSION

Finding that plaintiffs are not entitled to declaratory relief and reimbursement, the Court **DENIES** plaintiffs' motion for summary judgment. Further finding that defendants are entitled to judgment as a matter of law on Count IV of plaintiffs' complaint, the Court **GRANTS** defendant's motion for partial summary judgment. The Court **GRANTS** plaintiffs' motion to strike the Chihak Declaration and **DENIES** the motion to strike the Bedoe and Sanders declarations.

IT IS SO ORDERED.

DATED: November 20, 2007

Honorable Janis L. Sammartino
United States District Judge